## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**UNITED STATES OF AMERICA,**

**v.**                                               Criminal No. **2:15CR7**

**CHRISTOPHER SMITH,**

      Petitioner.

### MEMORANDUM OPINION

Christopher Smith, a federal inmate proceeding *pro se*, filed this 28 U.S.C. § 2255 Motion to vacate, set aside, or correct his sentence. (ECF No. 230.)  Smith contends that he is entitled to relief upon the following grounds:[1]

| | |
|---|---|
| Claim One | "Ineffective Assistance of Counsel." (*Id.* at 4.) |
| Claim Two | "Constructive Amendment of [I]ndictment." (*Id.* at 5.) |
| Claim Three | "Contract Law/[B]reach of [P]lea [A]greement." (*Id.* at 6.) |
| Claim Four | "Misinformed of [E]ssential [E]lements of [] 924(c) [V]iolation." (*Id.* at 8.) |

The Government filed a response. (ECF No. 235.)  The Court subsequently directed Smith to show cause as to why Claims Two, Three, and Four should not be dismissed as procedurally defaulted, as those claims did not appear to be raised on direct appeal. (ECF No. 252.)  Smith filed a response, in which he conceded that those three claims were not raised on direct appeal. (ECF No. 256, at 1.)  Among other things, Smith stated that "the mere fact that the issues raised [in Claims Two, Three, and Four] were not brought up on direct appeal further substantiates Smith's

---

[1] The Court employs the pagination assigned by CM/ECF docketing system to the parties' submissions.  The Court corrects the capitalization, punctuation, and spelling in the quotations from Smith's submissions.

claims of ineffective assistance of counsel." (*Id.*) The Court liberally construes Smith's contention

to be that the perceived ineffective assistance he received from counsel constitutes good cause for

his procedural default.[2] For the reasons stated herein, Claim One will be dismissed because Smith

has failed to adequately demonstrate that he received ineffective assistance of counsel.   Claims

Two, Three, and Four will be dismissed, as they were procedurally defaulted.

## I. PROCEDURAL HISTORY

On April 22, 2015, the grand jury returned a four-count third superseding indictment

(the "Indictment") charging Smith with:

| | |
|---|---|
| Count I | Conspiracy to manufacture, distribute, and possess with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). (ECF No. 69, at 1–13.) |
| Count II | Possession with intent to manufacture and distribute one kilogram or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) in or about July 2014. (*Id.* at 14.) |
| Count III | Possession with intent to manufacture and distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) on September 11, 2014. (*Id.*) |
| Count IV | Possession of firearms in furtherance of, and use and carry of firearms during and in relation to, one or more drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1)(A).[3] (*Id.* at 15.) |

---

[2] In his response to the Court's Order to Show Cause, Smith requested an indefinite extension of time or stay in abeyance, "[d]ue to the corona virus pandemic." (ECF No. 256, at 1.) In this instance, an indefinite extension or stay is not feasible. The Court has afforded Smith the benefit of liberal construction and construed his Response as stating a colorable claim that good cause exists to excuse his failure to raise Claims Two, Three, and Four on direct appeal.  As such, further delay of proceedings is both unnecessary and unwarranted.

[3] Counts I, II, and IV each carried possible maximum terms of life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A); 18 U.S.C. § 924(c)(1)(A).  Count Three carried a maximum possible term of forty years imprisonment. *See* 21 U.S.C. § 841(b)(1)(B).

Smith filed a Motion to Dismiss the Indictment as untimely. (ECF No. 95.) Smith also filed a Motion to Suppress evidence seized from his cell phone. (ECF No. 97.) On July 24, 2015, the Court held a hearing to address the two motions. (ECF No. 135.) On July 27, 2015, the Court issued an Order denying both the Motion to Dismiss and the Motion to Suppress. (ECF No. 137.)

The following day, on July 28, 2015, Smith entered a written Plea Agreement (ECF No. 145) and Statement of Facts (ECF No. 146) with the Government. Smith stipulated that had the matter gone to trial, the Government would have proved the following facts beyond a reasonable doubt:

> From in or about the fall of 2013 until the date of this plea hearing the defendant, CHRISTOPHER SMITH, was the Godfather or highest ranking member of the Imperial Gangsta Bloods [("IGB")], a Bloods set based in Portsmouth, Virginia, engaged in narcotics trafficking. Working with members of the [IGB] and others, the defendant distributed and possessed with intent to distribute in excess of 4.25 kilograms of heroin in the Eastern District of Virginia. The [IGB] membership exceeded five people, who were managed by the defendant and others within the organization, and who distributed narcotics for the organization.
>
> In the beginning of 2014, SMITH began purchasing heroin from A.O., a/k/a "Muscle." SMITH would regularly purchase over $10,000 worth of heroin each time. Muscle supplied SMITH with several kilograms of heroin during the beginning of 2014.
>
> In April of 2014, SMITH found a new supplier in New York named Ricky Jackson, a/k/a "Sosa," who sold SMITH high purity heroin. SMITH had met Jackson at the end of 2013 and purchased 50 grams of heroin from him at that time. Once the business relationship was formalized, SMITH purchased 150 grams of pure heroin in April, 300–400 grams of heroin in May, half a kilogram in June, and half a kilogram in July. For the July trip Smith used his brother, Dwayne Banks, and his girlfriend, J.M., to make the purchase. After each of these trips, Smith cut the heroin and then gave it to members of the IGB, including Junious Whitaker, to sell on behalf of the gang. In September of 2014 Smith intended to purchase a kilogram of heroin, but his money was short and he could only purchase approximately 280 grams and cutting agent. Smith was arrested on . . . the trip back to Virginia.

3

During August of 2014, SMITH'S gang and a drug organization run by Jason and Jeremy Saunders were involved in several altercations stemming from the groups' heroin dealing operations. At one point in August 2014, SMITH gave the order for the Saunders brothers to be eliminated. On August 19, 2014, gang members Junious Whitaker, a/k/a "Redd," P.S., and "Little Homie" ambushed Jeremy Saunders and shot him three times. Five days later, SMITH, Redd, and P.S. attacked the Saunders' drug distribution center located on Appomattox Avenue in Portsmouth. Shots were fired by both sides, but no one was injured. SMITH carried a gun during this attack but failed to disengage the safety and was not able to get off a shot during the battle.

While incarcerated, Smith has regularly informed non-incarcerated gang members of which IGB members were cooperating with law enforcement. He has also instructed those gang members to tell other gang members who are incarcerated about who is cooperating. Although he never gave a direct order to hurt or kill a government cooperator, the nature of the conversations clearly indicates he was trying to dissuade witnesses from testifying. SMITH also used more subtle means to attempt to dissuade his former girlfriend J.M. to refuse to testify against him either. SMITH even used the Court's own PACER system to identify cooperators through plea hearings and transportation orders.

The acts taken by the defendant in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offenses charged . . . nor does it identify all of the persons with whom the defendant may have engaged in illegal activities . . . .

(ECF No. 146, at 1–4 (paragraph numbers omitted).)   Among other things, Smith's Plea

Agreement contained the following clause:

The defendant agrees to plead guilty to Counts One and Four of the pending indictment. Count One charges the defendant with Conspiracy to Distribute Narcotics, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A). The maximum penalties for this offense are: a mandatory minimum term of twenty years of imprisonment as a result of the defendant's prior felony drug conviction, a maximum term of life imprisonment . . . . The United States agrees to file an information pursuant to Title 18, United States Code, Section 851, relying on only one prior felony drug conviction.[4]   Count Four charges the defendant with

---

[4] Smith had two prior felony drug convictions. (ECF No. 161 ¶¶ 30, 45, 47, 52.)

4

> Possession of Firearms in Furtherance of, and Using and Carrying Firearms During and in Relation to, One or More Drug Trafficking Crimes, in violation of Title 18, United States Code, Section 924(c). The maximum penalties for Count Four are: a mandatory minimum term of five years of imprisonment consecutive to the sentence imposed on Count One, a maximum term of life imprisonment . . . .

(ECF No. 145, at 1–2.)

On that same day, July 28, 2015, Smith appeared before a Magistrate Judge for a plea hearing. (ECF No. 207, at 1–2.) The Magistrate Judge placed Smith under oath, and Smith acknowledged that he was subject to prosecution for perjury if he testified falsely. (*Id.* at 4–5.) Among other things, Smith testified that he:

1. reviewed the indictment and charges with his attorney (*id.* at 7);
2. understood the elements of Count I that the Government had to prove (*id.* at 8);
3. understood that he was facing a life sentence on Count I (*id.* at 8–9);
4. understood that Count I carried a minimum sentence of ten years (*id.*);
5. understood that if the Government established that he had a prior conviction, the ten-year minimum sentence he faced on Count I would increase to a twenty-year mandatory minimum (*id.* at 9);
6. understood the elements of Count IV that the Government had to prove (*id.* at 9–10);
7. understood that he faced a life sentence on Count IV (*id.* at 10);
8. understood that Count IV carried a minimum sentence of five years (*id.*);
9. acknowledged the Statement of Facts he signed before the Court (*id.* at 25–28);
10. read the Statement of Facts (*id.* at 25);
11. reviewed the Statement of Facts with his attorney (*id.*);
12. understood everything in the Statement of Facts (*id.*);
13. agreed with everything contained in the Statement of Facts (*id.* at 27);
14. acknowledged the Plea Agreement he signed before the Court (*id.* at 12);
15. read the Plea Agreement and went over it with his attorney (*id.*);
16. understood everything contained in the Plea Agreement (*id.*);
17. acknowledged that a prior plea offer had been extended by the Government, but that he had rejected it (*id.* at 12–13);
18. stated that the decision to reject the prior plea offer was his own decision (*id.* at 13);
19. understood that he had a right to plead not guilty (*id.* at 13–14);
20. stated that no one had made any promises in exchange for his plea that were not contained in his Plea Agreement (*id.*);
21. stated that no one had threatened him or tried to force him to plead guilty (*id.*);
22. understood that if the Government recommended a particular sentence, that recommendation would not be binding on the Court (*id.* at 17);

23. understood that if the Government did not oppose his attorney's recommended sentence, or even if the Government agreed with his attorney about an appropriate sentence, the Court would not be required to follow that recommendation (*id.*);

24. acknowledged that he had time to discuss his case with his attorney (*id.*);

25. stated that he had "[f]ully" discussed the facts of his case with his attorney (*id.*);

26. stated that he was satisfied that his attorney had fully considered the facts of the case and discussed with him any possible defenses that he may have (*id.*);

27. understood that the sentencing guidelines applied to both Counts I and IV and that the Court would consult the guidelines when determining his sentence (*id.* at 18);

28. understood that various factors impacted the guidelines, including his conduct, the role that he played in the conspiracy, any obstruction he may have engaged in, his criminal history, and his acceptance of responsibility (*id.*);

29. understood that the guidelines were advisory, but that the Court would give them consideration at sentencing (*id.*);

30. understood that following the hearing, but before sentencing, a presentence report would be generated (*id.* at 19);

31. understood that it would be impossible for the Court or his attorney to know precisely what the guidelines would recommend until the presentence report was generated (*id.*);

32. discussed sentencing guidelines with his attorney (*id.*);

33. discussed the various considerations that go into determining the guidelines with his attorney (*id.* at 19–20);

34. understood that any discussion of the guidelines that he had previously with his attorney was only an estimate or a prediction (*id.* at 20);

35. understood that he would not be able to withdraw his guilty pleas if his attorney's prediction of the guidelines turned out to be inaccurate (*id.*);

36. understood that he was giving up the right to appeal his convictions and "any sentence that the Court imposes up to and including the statutory maximum" as part of his Plea Agreement (*id.* at 20–21);

37. reaffirmed that he understood that by signing this Plea Agreement and pleading guilty to Counts I and IV, he was "giving up [his] right to appeal [his] convictions, and any sentence the Court imposes up to and including life in prison" (*id.* at 21);

38. stated that he entered the Plea Agreement and his pleas to both Count I and Count IV freely and voluntarily (*id.* at 21, 24–25);

39. stated that he was pleading guilty because he was in fact guilty (*id.* at 24–25); and,

40. acknowledged that the Government could prove the case against him beyond a reasonable doubt (*id.* at 27).

The Magistrate Judge found that Smith's pleas were knowing and voluntary and that they were supported by an independent basis in fact. (*Id.* at 28.) The Magistrate Judge accepted Smith's guilty pleas to Counts I and IV. (*Id.*; *see also* ECF No. 148, at 1.) The Magistrate Judge informed Smith that, while he had accepted Smith's guilty pleas, it remained for the District Court to find him guilty and impose his sentence. (ECF No. 207, at 28.) Pursuant to the Plea Agreement, the

Government filed an information certifying only one of Smith's two prior felony drug convictions, (ECF No. 140), thereby increasing Smith's mandatory minimum term of imprisonment for Count One from ten to twenty years. *See* 21 U.S.C. § 841 (b)(1)(A) (West 2008).[5]

Following Smith's plea hearing, the probation officer generated a Presentence Investigation Report ("PSR"). (ECF No. 161.) The PSR categorized Smith as a "career offender" based upon his criminal record. (*Id.* ¶¶ 30, 52.) Smith received a Total Offense Level of 40 and a Criminal History Category of IV, resulting in an advisory guidelines range of 360 months to life imprisonment on Count I, plus a consecutive 60-month sentence on Count IV. (*Id.* ¶¶ 85–86.)

On October 30, 2015, Smith appeared before the District Court for sentencing. (ECF No. 208.) The Court found Smith guilty based on his prior pleas before the Magistrate Judge. (*Id.* at 1.) The Court then heard arguments from counsel on Smith's objection to the PSR and concluded that he was not entitled to credit for acceptance of responsibility. (*Id.* at 4–7.) The Government argued that based on his various attempts to influence witnesses and obstruct justice pending trial, Smith was not entitled to any additional credit. (*Id.* at 7.) The Court overruled Smith's objection, finding that "from beginning to end," Smith had engaged "in attempts to intimidate witnesses and to avoid the fate which befell him any way he could," concluding that "Mr. Smith has not accepted responsibility." (*Id.*)

The Government called two of Smith's confederates to testify about his leadership role in the IGB, his extensive narcotics trafficking experiences, and various related crimes of violence. (*Id.* at 9–48.) Smith called the mother of his child to speak to his good character. (*Id.* at 49–58.)

---

[5] Had the Government certified both of Smith's prior felony drug convictions, he would have faced a mandatory life term. *See* 21 U.S.C. § 841 (b)(1)(A) (West 2008).

The Government recommended a sentence of 420 months to life on Count I, plus 60 months on Count IV. (*Id.* at 66.) Smith's attorney called the Government's request "ridiculous," arguing that "40 year[] [sentences] should be reserved for the absolutely most heinous murders and rapes and maimings and sex offenses." (*Id.* at 66–67, 69–70, 73.) Smith's attorney argued that the mandatory minimum sentence of twenty-five years established by Congress was "sufficient but not greater than necessary" to punish Smith for his crimes. (*Id.* at 66–67.)

Before pronouncing the sentence, the Court gave Smith an opportunity to give a statement. (*Id.* at 74–76.) Smith apologized to society and to his family and proclaimed that he is "now rehabilitated and [that he] follow[s] the path of Jesus Christ." (*Id.* at 75–76.) Smith claimed that he is "not the violent individual that [he was] depicted to be," and asked the Court to "take into consideration that nobody was hurt physically in this matter." (*Id.* at 74.)

In pronouncing Smith's sentence, the Court stated the following:

> [W]hat happened here and Mr. Smith's role in it was just awful. It was evil, not just . . . it was the most conscienceless behavior I've seen in 39 years of practicing law.
> Mr. Smith imported enormous amounts of heroin into the Portsmouth area. His henchmen sold it on the street. He tried to kill rival dealers. His statement today that he didn't do anything violent is just completely belied by the Statement of Facts in this case.
> The Statement of Facts to which he agreed says that during August of 2014, Smith's gang and the drug organization run by Jason and Jeremy Saunders were involved in several altercations stemming from the group's heroin dealing operations. At one point in August 2014, Smith gave the order for the Saunders brothers to be eliminated.
> And then it says that on August 19th, Redd, PS, and Lil Homie ambushed Jeremy and shot him three times.
> I saw the video of it . . . and candidly I don't see how they could have missed him -- how he survived that. They must be just awful shots . . . it's surprising to me that they're still alive.
> 5 days later . . . Smith, Redd, and PS attacked the Saunders' distribution center located on Appomattox Avenue in Portsmouth. Shots were fired from both sides. No one was injured.

Smith carried a gun during this attack but failed to disengage the safety and was not able to get off a shot during the battle.

So, you know, that's just -- that belies any statement that he's not [violent].   And also, his Statement of Facts also belies any suggestion that he was not trying to influence gang members on the outside, because he also signed off on this.

While incarcerated, Smith has regularly informed non-incarcerated gang members of which IGB members were cooperating with law enforcement. . . .

So in other words, he got the word out to people in jail and people out of jail about who was cooperating.  And the only reason to do that is to intimidate those people.  He was one of the highest ranking members in the Bloods, and certainly ran the show in Portsmouth.

The nature and circumstances of this offense are horrible.

The history and characteristics of the defendants.   Well, obviously he has a long criminal history and, as I look at it, the only time he's not committing crimes is when he's in jail. . . .

       . . . .

. . . If I had to summarize his character, I would simply say that he is evil.

       . . . .

. . . [T]his whole Blood operation in Portsmouth is just incredibly, incredibly bad.  It's a very serious offense.  We have not only the drug aspect of it, which poisons the lives of everybody who uses the heroin that comes into Portsmouth, but then we have all of these other things that were part of the -- I guess you'd call it the business plan for the Bloods, which involves violence and intimidation.  I don't see how anybody could feel safe living in Portsmouth with Mr. Smith on the street.

. . . I'm to consider . . . the need to promote respect for the law, and obviously it's none of it here.  Just punishment requires a long sentence.

Now, Mr. Sacks makes the point that our sentencing laws are out of control in terms of the length of sentences, and that when he and I were both starting out, a life sentence meant that you got out in 15 years . . . .

Sentences in many cases are too long, especially for drug offenses, but this goes way beyond drug offense . . . .  Mr. Sacks said that [a forty-year sentence] was the kind of thing that ought to be reserved for people who murder or commit sex offenses, or rape, or maim or whatever.  Well, only by bad marksmanship are we not there today.

This conduct is every bit as vile as what you see in murders, rapes, and so forth.

       . . . .

9

. . . I don't know what gets people into this lifestyle -- well, I have some ideas about it, but I know that lengthy sentences don't deter anybody from going into it . . . . [H]ere you have a man who spent years in prison and what he's trying to do is figure out a way he can become a kingpin when he gets out . . . .

. . . [There is] a need for the sentence to protect the public from further crimes of the defendant.

This is clearly, I think, the most important factor in this case. Mr. Smith was a threat to everybody in Eastern Virginia, maybe even farther away. There's nothing more to say about it than that. He just was a threat to everybody within driving range of wherever he was.

. . . .

There's a motion for a variance today to vary downward to the mandatory minimum sentence of 25 years, and essentially the basis for Mr. Sacks arguing that is that 25 years essentially is long enough for him to learn his lesson and become a better person . . . .

That motion is denied. These facts are just too bad, too incredibly bad, for anything underneath the guideline range.

All right. Stand up, please, Mr. Smith.

Mr. Smith, for the reasons that I just stated, and while there is a long range of times that I could give you, I think that I've articulated the things that concern me most in this case.

I sentence you to . . . life on the drug charge and 5 years to run consecutive to that on the gun charge.

. . . I think that this sentence is sufficient but does not exceed the amount of time necessary to achieve the goals of sentencing as set forth in 18 US Code, Section 3553.

Specifically, a sentence of life plus this extra 5 years will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes that Mr. Smith may commit.

. . . .

Mr. Smith, it's a long time, sir, and . . . I hope you have made peace with your creator, as you indicated today. Good luck, sir, and God bless you.

(*Id.* at 77–86.)

After Smith was sentenced on Counts I and IV, the Government, pursuant to the Plea Agreement, moved to dismiss the remaining counts. (*Id.* at 86.) The Court granted that motion. (*Id.*)

Smith noted an appeal. (ECF Nos. 196, 197.) Smith argued that the Court erred (1) by denying his motion to dismiss the Indictment on timeliness grounds, and (2) by "imposing an unreasonably lengthy sentence of life plus 60 months." *United States v. Smith*, No. 15–4654 (4th Cir. May 10, 2016); (ECF No. 40, at 2.) The United States Court of Appeals for the Fourth Circuit dismissed Smith's appeal based on the waiver of appellate rights contained in the Plea Agreement. (ECF No. 214.) After the United States Supreme Court denied Smith certiorari (ECF No. 227), Smith filed the § 2255 Motion (ECF No. 230) that is presently before the Court.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient, and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

In the context of a guilty plea, the Supreme Court has modified this second prong of *Strickland* to require the defendant to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*

11

*v. Lockhart*, 474 U.S. 52, 59 (1985).  In the absence of extraordinary circumstances, the truth of the sworn statements made during a Rule 11 plea hearing is "conclusively established."  *United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005).

In his § 2255 Motion, Smith presents Claim One, which generically avers that Smith's attorney was ineffective without providing any details or factual support for that allegation. (ECF No. 230, at 4.)  Smith did, however, provide a rambling, and, at times, incoherent seventy-four-page Memorandum in Support, which he purports to incorporate into his § 2255 Motion. (ECF No. 231.)  In his Memorandum in Support, which lacks discernable structure and organization, Smith includes a number of thoughts and arguments, some of which appear to be inchoate, which the Court has nevertheless reviewed and considered.  As best as the Court can discern, Smith's Claim One can be divided into the following subparts:

(1) Counsel "never attempted to ascertain whether the factual predicate of the firearms offense was satisfied, [or] to inform [Smith] fully as to the nature of those charges" (*id.* at 5);

(2) Counsel "fail[ed] to object to the fact[] [that] the Court constructively amend[ed] Count[s] 1 and 4 of the [I]ndictment by altering [them] to change the elements of the offense charged" (*id.* at 8);

(3) Counsel "informed . . . [Smith] that if he [did] not plead guilty that his mother and sister would be indicted" (*id.* at 52); and,

(4) Counsel "advised [Smith] that if he pleaded guilty, that he would receive 30 years in prison instead of life" (*id.* at 54).

Smith's attorney, Andrew Sacks, submitted a very detailed affidavit denying each claim. (ECF No. 235-2.)  Specifically, Mr. Sacks stated that his "pretrial and pre-plea investigation disclosed sufficient evidence of the factual predicate for the firearms offense," which was reflected in "the Statement Of Facts signed by [Smith] . . . which was affirmed by him under oath," and was "confirmed and corroborated" by the Government's witnesses at sentencing. (*Id.* at 7.)  Mr. Sacks

12

further maintained that he did not object to the "constructive amendment" of the Indictment because the Indictment was never constructively amended. (*Id.* at 7–8.) Mr. Sacks also flatly denies that he told Smith his family may face criminal sanctions if he did not plead guilty, or that he promised Smith that he would receive any sentence in particular. (*Id.* at 9–10.)

As an initial matter, Smith's constructive amendment claim (Claim One, Subpart 2) is one of the more incoherent aspects of his § 2255 Motion and is obviously deficient. Smith pled guilty to and was sentenced upon the same Indictment that was returned by the grand jury without modification or adulteration. Neither the Government, nor the Court, nor Smith's attorney amended the Indictment, either actually or constructively, nor did either party offer any arguments even suggesting such a change. As Mr. Sacks correctly articulates, "the Government simply presented evidence and argument that was relevant in support of their sentencing position on the Counts of conviction." (*Id.* at 8.) While Mr. Sacks attempted to "refute[] the accuracy and weight of [the Government's] evidence . . . no good faith [basis] in law or in fact . . . would have warranted the kind[] of objection[] that [Smith] claims [Mr. Sacks] should have made." (*Id.*) As such, Smith has failed to show that Mr. Sacks was deficient in this regard, much less that he was prejudiced in any way.

As for Claim One, Subparts 1, 3, and 4, Smith remains bound by his prior sworn statements at the Rule 11 plea hearing. *See Lemaster*, 403 F.3d at 221–22; *see also Fields v. Attorney Gen. of State of Md.*, 956 F.2d 1290, 1297–99 (4th Cir. 1992) (observing that statements made under oath at Rule 11 hearing are binding absent "clear and convincing evidence to the contrary"). Smith's newly-minted claims to the contrary are self-serving and conclusory, and do not constitute "clear and convincing evidence," or establish the sort of "extraordinary circumstances" that would require the Court to consider Smith's prior sworn statements at the Rule 11 plea hearing to be

13

anything other than truthful. *Lemaster*, 403 F.3d at 221–22. Consequently, Smith's prior sworn statements are "conclusively established." *Id.*

At the Rule 11 hearing, Smith expressly stated that he understood the elements of Count IV and what the Government had to prove to convict him. (ECF No. 207, at 9–10.) Smith acknowledged the Statement of Facts that he had signed. (ECF No. 207, at 25–28.) Smith said that he read it, understood it, reviewed it with his attorney, and agreed with everything contained in it. (*Id.*) Smith further said that he was pleading guilty because he was in fact guilty, and he expressly conceded that the evidence was sufficient to prove his guilt beyond a reasonable doubt. (*Id.* at 24–25, 27.) Smith also expressly told the Magistrate Judge that he had "[f]ully" discussed the facts of the case with his attorney and that he was satisfied that his attorney had fully considered the facts of the case and discussed with him any possible defenses. (*Id.* at 17.) Given the foregoing exchange, Smith has failed to show that counsel was deficient with regard to Claim One, Subpart 1, much less that he was prejudiced in any way.

Smith further testified that he had not been threatened in any way and that no one had tried to force him to plead guilty. (*Id.* at 16.) Consequently, Smith has again failed to show that counsel was deficient with regard to Claim One, Subpart 3, much less that he was prejudiced in any way.

Smith also testified that he had not been promised anything that was not contained in the Plea Agreement. (*Id.*) Moreover, the Magistrate Judge expressly warned Smith that the Court would not be bound at sentencing by any recommendation made by the Government or his attorney, even if they agreed to recommend the same sentence. (*Id.* at 17.) Smith indicated his understanding. (*Id.*) Consequently, Smith has failed to show that counsel was deficient with regard to Claim One, Subpart 4, much less that he was prejudiced in any way.

14

Finally, in his response brief to the Government's Motion to Dismiss, Smith seems to recast Claim One in terms that seem to strike more to the heart of his concerns. Specifically, Smith states that "[c]onsidering he could have went to trial and received the same life sentence," it was an error for Mr. Sacks to "not inform[] him that he would receive life even after accepting the Plea Agreement." (ECF No. 236, at 4.) Smith states that he "never would have accepted a guilty plea had he known the result would be a life sentence." (*Id.*) Smith then goes on to say that his plea was the product of fear and coercion because Mr. Sacks told him that if he did not accept the Government's plea, he would receive a life sentence. (*Id.* at 2.) This latest iteration of Claim One continues to miss the mark.

The Magistrate Judge warned Smith that any discussion he may have with his attorney concerning his sentencing guidelines would only be an estimate or a prediction. (ECF No. 207, at 19–20.) The Magistrate Judge also expressly warned Smith that the Court would not be bound at sentencing by any recommendation made by the Government or his attorney. (*Id.* at 17.) The Magistrate Judge further cautioned Smith that his Plea Agreement contained an appeal waiver, which meant that he gave up the right to appeal "any sentence that the Court imposes up to and including life in prison." (*Id.* at 21.) In each instance, Smith indicated his understanding. (*Id.* at 17, 19–21.) Thus, Smith cannot fairly claim he was not aware of the gravity of his situation.

Simply put, Mr. Sacks could not fairly and accurately "inform[] [Smith] that he would receive life," as Smith seems to think he should have done. First, Mr. Sacks (and the attorneys for the Government) have only the power to recommend a sentence to the Court. As the Magistrate Judge told Smith, the Court was free to sentence Smith as it saw fit, notwithstanding any recommendations to the contrary. Second, and more importantly, Mr. Sacks could not tell Smith what sentence he would receive with certainty because there was no way for Mr. Sacks, or anyone

15

else for that matter, to know what sentence Smith would receive before he received it. The Court did not decide Smith's sentence until after it had heard from all the witnesses, heard all the arguments, and heard Smith's statement to the Court. As such, the Court cannot fault Mr. Sacks for failing to prospectively tell Smith with certainty that he would receive life, or any other specific sentence for that matter, as Mr. Sacks simply lacked the power to bring about that particular result.

Conversely, and somewhat incongruously, Smith also finds fault with Mr. Sacks advising him that he would face a life sentence if he did not plead. What Smith mistakes for error, the Court views as providing sound legal advice based upon a realistic assessment of the facts. If Smith decided to hazard a trial as fully charged, there was a very high probability that Smith would end up receiving at least one life sentence, if not multiple life sentences. Bluntly, the Government held all the cards in this instance, and when Smith was unable to influence or intimidate witnesses as effectively as he had wished, he was left with little in the way of bargaining power.[6]

Any fear or coercion that Smith felt given the unenviable position he found himself in was solely of his own making. Put another way, the fact that Smith lacked a plethora of quality options in negotiating his plea is a result of his conduct in this case, both before and after being arrested, and is not attributable to anything that his attorney may have done or not done.

---

[6] The case against Smith was exceedingly strong. *Inter alia*, Smith was caught returning from New York with a copious amount of heroin; his motion to exclude incriminating cell phone evidence was denied; at least two of his confederates were willing to testify against him about his extensive drug trafficking, gang involvement, and related crimes of violence; and the Government could clearly demonstrate Smith's extensive efforts to intimidate and influence witnesses, which could be admitted at trial to show consciousness of guilt, and at sentencing as an aggravating factor. Three of the four charges against Smith carried possible life sentences. If the Government chose to certify two of Smith's prior felony drug convictions, instead of one, he would have faced a mandatory life sentence. If Smith went to trial, the likelihood of convictions was very high. Opting for trial under these circumstances, it would seem, would have been an unreasonable decision given the high probability of receiving a life sentence.

Mr. Sacks was able to talk the Government into dropping two charges that carried possible life sentences and only certifying one of Smith's prior drug felonies, thereby ensuring that he did not face a mandatory life sentence. He secured for Mr. Smith an opportunity to argue for only twenty-five years, which, in light of the facts of this case, and the witness intimidation that Smith engaged in, was a far more generous offer than Smith was reasonably entitled to expect. The mere fact that Mr. Sacks articulated to Smith the direness of his position does not constitute error.

At bottom, Smith simply wants to avail himself of the benefit of hindsight (*see* ECF No. 236, at 4 ("[Smith] never would have accepted a guilty plea had he known the result would be a life sentence")), to undo his Plea Agreement, despite the fact that he thoroughly acknowledged at the Rule 11 hearing that he knew the risks he was undertaking. Dissatisfied with the result, Smith blames his attorney for not being able to foresee the future. This is not a valid basis for an ineffective assistance of counsel claim. Smith has again failed to demonstrate that counsel was deficient, much less that he was prejudiced in any way.

Accordingly, Claim One, including Subparts 1–4, will be DISMISSED.

### III. PROCEDURAL DEFAULT

The procedural default rule bars Claims Two, Three, and Four from review here, absent a showing of cause and prejudice or actual innocence, because Smith could have raised, but did not raise, these claims on direct appeal. *See Bousley v. United States*, 523 U.S. 614, 622–23 (1998); *see also United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009) (internal quotation marks omitted) (citation omitted) (explaining that on collateral review a petitioner who waives the right to appeal "is precluded from raising claims that are the sort that *could have* been raised on appeal"). Smith seems to contend that the perceived ineffective assistance of counsel constitutes cause to excuse his default of these claims. (ECF No. 256, at 1.) That contention lacks merit for the reasons

17

discussed below. *Cf. United States v. Frady*, 456 U.S. 152, 167–68 (1982) (noting that when applying the dual standard of cause and prejudice courts need not examine the issue of cause, if prejudice is clearly lacking).

### A.    Claim Two

In Claim Two, Smith seems to argue that the Government "through its presentation of evidence and its closing argument," constructively amended the Indictment "by allowing proof of an alternative predicate offense not charged in the indictment, specifically the distribution of heroin." (ECF No. 231, at 4.) Smith also seems to argue that the Court erred by either allowing or participating in the constructive amendment of Counts I and IV. (*Id.* at 8.) Smith made a related claim against his attorney for failing to object to the putative constructive amendment. *See* Section II, *supra*. As discussed above, Smith's arguments concerning constructive amendment are incoherent and run counter to the facts of the case. As Mr. Sacks correctly stated in his affidavit, there was no amendment to the Indictment, constructive or otherwise. (ECF No. 235–2, at 7–8.) Just as the Court could not fault Mr. Sacks for failing to object to a putative amendment that never took place, the Court cannot fault Mr. Sacks for failing to address this issue at sentencing or on appeal to the Fourth Circuit. Because Smith fails to demonstrate deficiency or prejudice, Claim Two will be DISMISSED.

### B.    Claim Three

Claim Three, which Smith calls "Contract Law/[B]reach of [P]lea [A]greement, (*see* ECF No. 230, at 6), represents another oddity. Smith asks the Court to "consider whether [Smith] breached the Plea Agreement, and then . . . whether the parties entered into the agreement based on a mutual mistake . . . [and] ultimately . . . whether to cancel the Plea Agreement on principles of fundamental fairness." (ECF No. 231, at 33–34.) Smith concludes that he did not breach the

Plea Agreement and that the Government has no basis for canceling his Plea Agreement. (*Id.* at 38–39.)  Smith, therefore, posits, the Government should not be able to reinstate Counts II and III, which were dropped as part of the agreement. (*Id.* at 47–51.)  Underlying Smith's conclusion that he did not breach the Plea Agreement seems to be Smith's belief that the Court lacked the jurisdiction to sentence him. (*Id.* at 38–39.)

To the extent Smith seeks interpretation of his Plea Agreement, or questions the Court's jurisdiction to sentence him, those issues could have been raised prior to sentencing or on appeal. As a baseline, the Court is satisfied that jurisdiction in this case was proper.  Beyond that, given the indecipherable and wholly perplexing nature of Claim Three, the Court cannot fault Mr. Sacks for avoiding any mention of Claim Three at sentencing or on appeal.  Because Smith fails to demonstrate deficiency or prejudice, Claim Three will be DISMISSED.

### C.    Claim Four

Finally, in Claim Four, Smith alleges that the Court misinformed him of the essential elements of Count IV. (ECF No. 230, at 8; ECF No. 231, at 31, 42.)  In conducting the Rule 11 hearing, the Magistrate Judge thoroughly covered the elements of both Counts I and IV with Smith and ensured that he understood both charges before taking his pleas. (ECF No. 207, at 7–8, 9–10.) Throughout the colloquy, the Magistrate Judge conveyed the salient and relevant information to Smith concerning his charges and did not misstate the law. (*Id.*)  The Court can find nothing wrong with the Magistrate Judge's handling of the plea colloquy in this regard.  It would have been frivolous for defense counsel to object to the plea colloquy or attempt to raise the issue on appeal. As such, Smith has failed to show that counsel was deficient or that he suffered prejudice in this regard.

Smith, however, maintains that he is actually innocent of Count IV. (ECF No. 231, at 15, 28, 36–38.) Smith argues that the evidence only shows that a gun was present during his drug trafficking activities, not that he used it in furtherance of his drug trafficking activities. (*Id.* at 28, 36–38.) This argument lacks merit.

With respect to actual innocence, a "petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (citation omitted) (internal quotation marks omitted). Moreover, actual innocence means "factual innocence, not mere legal insufficiency." *Id.* (citation omitted). Smith has not satisfied his burden to demonstrate that he is factually innocent of possessing a firearm in furtherance of a drug trafficking crime. To the contrary, Smith admitted in a signed document, which he expressly acknowledged before the Magistrate Judge, that:

> . . . SMITH, was the Godfather or highest ranking member of the Imperial Gangsta Bloods [("IGB")], a Bloods set based in Portsmouth, Virginia, engaged in narcotics trafficking. Working with members of the [IGB] and others, the defendant distributed and possessed with intent to distribute in excess of 4.25 kilograms of heroin in the Eastern District of Virginia. The [IGB] membership exceeded five people, who were managed by the defendant and others within the organization, and who distributed narcotics for the organization . . . .
>
> . . . During August of 2014, SMITH'S gang and a drug organization run by Jason and Jeremy Saunders were involved in several altercations stemming from the groups' heroin dealing operations. At one point in August 2014, SMITH gave the order for the Saunders brothers to be eliminated. On August 19, 2014, gang members Junious Whitaker, a/k/a "Redd," P.S., and "Little Homie" ambushed Jeremy Saunders and shot him three times. Five days later, SMITH, Redd, and P.S. attacked the Saunders' drug distribution center located on Appomattox Avenue in Portsmouth. Shots were fired by both sides, but no one was injured. SMITH carried a gun during this attack but failed to disengage the safety and was not able to get off a shot during the battle.

(ECF No. 146, at 1–2.)

20

Smith's use of firearms in this instance goes far beyond mere possession, as Smith contends.  Consequently, he has failed to establish that he is actually innocent of Count IV.

Accordingly, Claim Four will be DISMISSED.

In sum, counsel reasonably refrained from raising the above claims at trial and/or on appeal.  Smith has failed to demonstrate deficiency or prejudice, actual innocence, or any other basis for excusing his default of Claims Two, Three, and Four.

### IV. CONCLUSION

Smith's § 2255 Motion (ECF No. 230) will be DENIED.  Smith's claims and the action will be DISMISSED.  A certificate of appealability will be DENIED.

An appropriate Order shall accompany this Memorandum Opinion.

It is so ORDERED.

Date: 16 September 2020
Norfolk, Virginia

/s/
John A. Gibney, Jr.
United States District Judge

21